The Honorable Benjamin H. Settle

1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF WASHINGTON
8                      AT TACOMA

9

10   UNITED STATES OF AMERICA,                NO.  MJ21-05185

11                       Plaintiff,
                                              GOVERNMENT RESPONSE TO
12                                            DEFENDANT'S MOTION FOR REVIEW
                                              OF MAGISTRATE COURT ORDERS OF
13          v.                                DETENTION

14   CALEB JESSIE CHAPMAN,

15                       Defendant.

16

17                      I.        Introduction

18          Chapman advances no reason to disturb the Court's well-founded detention order.

19   The Magistrate Judge appropriately found that the defendant presents a substantial risk to

20   the community based on the instant offense, his alleged pattern of domestic violence, and

21   the insufficient structure of his proposed release plan. The Government submits this

22   response to Defendant's Motion for Review Magistrate Court Orders of Detention.

23                      II.       Factual Background

24          At about 2:00 AM on August 29, 2021, CALEB CHAPMAN contacted R.H. at

25   R.H.'s home and gave R.H. a handwritten note that discussed his grievances with the

26   White House, his difficulty with obtaining ammunition, and referenced a pending

27   "revolution" starting on the Olympic Peninsula and in Texas. A copy of the note is

28   attached as Attachment A. At that time, CHAPMAN was armed with AR-15 rifle and a

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF        UNITED STATES ATTORNEY
MAGISTRATE COURT ORDERS OF                                     1201 PACIFIC AVENUE, SUITE 700
DETENTION                                                      TACOMA, WASHINGTON 98402
U.S. v. Chapman, MJ21-05185- 1                                       (253) 428-3800

1  handgun that was concealed in his waistband. R.H. told law enforcement that he did not

2  know CHAPMAN and that he was fearful when CHAPMAN showed up at his door at

3  that time of night with weapons.

4      At about 4:30 AM the same morning, the Peninsula Emergency Communications

5  Center (PENCOM) received a 911 telephone call reporting a wildfire burning in Olympic

6  National Park, about one mile south of the intersection of the Hurricane Ridge Parkway

7  and Mt Angeles Road. The Clallam County Fire Department and US Park Service

8  responded to this wildfire and extinguished it. A Washington Department of Natural

9  Resources wildland fire investigator responded to the fire and determined that it was

10  human caused and intentionally set.

11      Later that morning, PENCOM received a report that a tree had been cut down and

12  was blocking Deer Park Road within the boundaries of Olympic National Park. Deer Park

13  Road leads to Deer Park Campground and ends just below the summit of Blue Mountain.

14  A Park Ranger located one Douglas Fir tree that had been felled but had been moved to

15  the road shoulder by a Park Service contractor. The tree was originally blocking the road.

16  The Park Ranger located a second Douglas Fir tree that had been cut as if it was intended

17  to be felled but was still was standing.

18      At about 10:09 AM, Rangers located the vehicle that the defendant had arrived at

19  the park in.  An adult female, A.J., was still in the vehicle. A.J. told the ranger that she

20  was CHAPMAN's girlfriend, and that CHAPMAN was armed with multiple firearms

21  somewhere near them on Blue Mountain. On August 29, 2021, A.J. was interviewed by

22  agents. She told them that sometime after midnight on August 29, 2021, CHAPMAN,

23  who had been using methamphetamine, began acting erratically. At approximately 2:00

24  a.m., after dropping his kids off with his brother, CHAPMAN and A.J. went to R.H.'s

25  house to deliver a note CHAPMAN had written to R.H.

26      After speaking with R.H. and delivering his note to at least one other personal

27  acquaintance, CHAPMAN and A.J. drove to the Deer Park campground in the Olympic

28  National Park. On their way to the campground CHAPMAN drove up the Hurricane

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 2

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Ridge Parkway a short distance, stopped the truck, and walked into the woods. Shortly

2  thereafter A.J. saw embers from a fire near CHAPMAN's location. Upon his return to the

3  truck, CHAPMAN smelled of gasoline. Though A.J. described the fire as being on the

4  Deer Park Road, the fire was found to be within the first mile on the Hurricane Ridge

5  Parkway and investigators believe that A.J. mixed up the names of the roads.

6       While traveling towards the campground, up Deer Park Road, A.J. indicated

7  CHAPMAN stopped the truck multiple times. A.J. observed CHAPMAN exit the truck

8  and she heard a chainsaw being operated. It was dark and she was unsure of what he was

9  doing. This activity as described by A.J. is consistent with the location of the felled tree

10  observed by NPS employees.

11       At approximately 6:00 a.m. on August 29, A.J. and CHAPMAN arrived at the

12  Deer Park Campground area. According to A.J., CHAPMAN became increasingly upset.

13  CHAPMAN told A.J. that she was going to die because of the "revolution." CHAPMAN

14  made suicidal comments about himself, including telling A.J. that he was never going to

15  see his children again and that this was his "last day." A.J. stated that she was able to

16  surreptitiously dial 911 from a cell phone during this time.  CHAPMAN became aware of

17  this, and grew enraged, telling A.J. that she didn't know what she had just done.

18       While arguing with A.J., CHAPMAN threw a full and unopened soup can at A.J.,

19  hitting her and causing a laceration to her leg. CHAPMAN proceeded to grab A.J. by the

20  head and hit her head, repeatedly, against the car seat while telling A.J. to "shut up." A.J.

21  then observed CHAPMAN leave the truck and walk into the woods while yelling and

22  screaming. A.J. stated that when CHAPMAN left he was wearing a black colored tactical

23  vest, a sleeveless shirt, jeans, and was armed with a semi-automatic rifle, a shotgun, and

24  multiple handguns. During the investigation, law enforcement officers observed a

25  laceration on A.J.'s leg. A.J. reported to law enforcement in a later interview that

26  CHAPMAN held a knife to her wrist prior to their arrival to the park because he wanted

27  to "cut the chip out" of her wrist. She was able to get her arm away from him before he

28  cut into her.

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 3

1   A.J. told agents that CHAPMAN had been talking about a "revolution" and he

2   believes that there is going to be an armed conflict with the government. A.J. told

3   investigators that she did not believe that CHAPMAN would harm the public but

4   believed he will act violently towards law enforcement if he feels threatened. A.J. also

5   believed that CHAPMAN has additional methamphetamine in his possession.  Agents did

6   locate methamphetamine with CHAPMAN's possessions in the forest.

7   Rangers then evacuated the Deer Park campground, trailheads, and road areas. For

8   the next few hours, NPS Rangers, Port Angeles Police Officers, Clallam County Sheriff's

9   Deputies and Federal Bureau of Investigations (FBI) Special Agents (SA) attempted to

10   locate CHAPMAN using exigent cellular telephone location data (pings), and a police

11   dog.

12   At about 3:00 PM, the Olympic National Park radio communications site (radio

13   repeater) located at summit of Blue Mountain suddenly stopped functioning. This radio

14   repeater is owned by the National Park Service. It is used by Olympic National Park for

15   emergency response, public safety, and administrative radio communications.

16   On August 31, 2021, at approximately, 9:00 PM, CHAPMAN was located by an

17   Unmanned Aircraft System (UAS) commonly referred to as a "drone."  CHAPMAN was

18   inside the Ford F-250 pick-up truck that was still parked at the Blue Mountain Summit

19   parking lot. The UAS was remotely operated by law enforcement and was being used to

20   perform a reconnaissance of the area. CHAPMAN fired at the UAS with a modified

21   Remington, Model 870, pump-action shotgun with an overall length of less than 26

22   inches (the stock had been removed).

23   Law Enforcement Officers were ultimately able to contact CHAPMAN on his cell

24   phone and were eventually able to negotiate his surrender.  At about 9:51 PM, after a

25   SWAT team and BearCat were on scene, CHAPMAN surrendered to the FBI Agents and

26   was placed under arrest. This was two and a half days after he initially entered the Park

27   with A.J and over two days after the Park was evacuated.

28

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   After CHAPMAN was arrested, NPS and FBI officers seized as evidence four

2   semi-automatic pistols, two semi-automatic rifles, and one 20-gauge pump action shotgun

3   from areas adjacent to CHAPMAN's arrest.  In CHAPMAN's truck, law enforcement

4   observed two Stihl chainsaws and multiple boxes of ammunition in plain view.  In total,

5   law enforcement recovered 3,883 total rounds, including 12 types of ammunition, and 15

6   loaded magazines (some taped together for quick reloading) from the defendant's vehicle

7   and belongings in the Park.

8   Agents then searched the Blue Mountain radio repeater site with the assistance of

9   the NPS IT Specialist, who is a subject matter expert regarding NPS radio repeaters.  He

10  observed that the padlock had been removed and the repeater had been tampered with,

11  including the radio repeater power cable and the transmitting antenna cable, which were

12  removed from the radio repeater.

13  The NPS Agents searched the general area around the summit of Blue Mountain

14  parking lot. There, they found two caches of CHAPMAN's items that had been left on

15  the Blue Mountain "rainshadow trail." At these locations, agents found several hundred

16  live  ammunition cartridges in various calibers and quantities (included in the count

17  above), a loaded Smith & Wesson MP 9mm semi-automatic pistol, radio repeater

18  electrical components, an Olympic National Park radio frequency list, a radio

19  microphone, food and water, knives, general survival equipment, a brown leather journal

20  with CHAPMAN's photograph on it, personal items and identification cards belonging to

21  CHAPMAN, A.J. and other individuals, along with a baggie of methamphetamine.

22  When performing records checks of the Smith & Wesson MP .40 caliber semi-

23  automatic pistol, serial number HVN7197, that was seized in the area surrounding

24  CHAPMAN at the time of his arrest, Port Angeles Police determined this pistol was

25  reported as stolen to the Port Angeles Police Department in 2017.

26  On September 1, 2021, the defendant had an initial appearance on a Complaint

27  charging him with one count of Assault by Striking, Beating or Wounding in violation of

28  Title 18, United States Code, Section 113(a)(4).  The detention hearing was set for

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 5

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  September 7, 2021 and he was detained.  Defendant filed a motion to reopen the

2  detention hearing and a hearing was held on September 23, 2021.  The Court found that

3  while there was new information presented, it was not material to the issue of whether

4  there are conditions of release that will reasonably assure the appearance of the person as

5  required and the safety of any other person in the community.  This motion followed.

6                                   III.       Legal Standard

7          Defendant is both a flight risk and a danger to the community due to his erratic

8  and dangerous behavior while on methamphetamine.  Regarding flight risk, while the

9  defendant only has one FTA that is twenty years old, his behavior in this case shows his

10  desire and ability to evade law enforcement at least while under the influence of

11  methamphetamine.  As to the latter, the circumstances of the offense conclusively show

12  he is a danger to the community.  While these risks currently appear to be tied to his

13  methamphetamine use, his status as a habitual user and the inability of any conditions of

14  release to truly prevent him from using methamphetamine support the Magistrate Judge's

15  findings.  This motion should therefore be denied.

16          **A.       Standard of Review.**

17          An appeal of a magistrate's detention order is governed by 18 U.S.C. § 3145(b),

18  which provides: "If a person is ordered detained by a magistrate judge, . . . the person

19  may file, with the court having original jurisdiction over the offense, a motion for

20  revocation or amendment of the order . . ."  The district court then reviews de novo the

21  magistrate judge's detention order.  *See United States v. Koenig*, 912 F.2d 1990, 1192

22  (9th Cir. 1990).  The district court need not give deference to the findings or the ultimate

23  conclusion of the magistrate judge.  *Id.*

24          **B.       Judge Fricke Correctly Ordered Defendant Detained.**

25          Judge Fricke properly detained the defendant at his original detention hearing and

26  at the hearing on the defendant's motion to reopen.  Nothing offered on the defendant's

27  motion for review changes that analysis.

28          //

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 6

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    **1.      General Standards for Detention**

2        This Court is quite familiar with the legal standards governing detention or

3    release.  To summarize, the Bail Reform Act provides that a court should detain a

4    defendant pending trial if "no condition or combination of conditions . . . will reasonably

5    assure the appearance of the person as required and the safety of any other person and the

6    community."  18 U.S.C. § 3142(f).  The United States typically bears the burden of

7    showing that a defendant poses a danger to the community by clear and convincing

8    evidence, and it bears the burden of showing that a defendant poses a flight risk by a

9    preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1120 (9th Cir.

10   1991).

11       In determining whether there are conditions of release that will reasonably assure

12   the appearance of the defendant and the safety of the community, this Court must

13   consider the nature and circumstances of the offense charged, the weight of the evidence,

14   the defendant's history and characteristics, and the nature and seriousness of the danger

15   posed by the defendant if released. 18 U.S.C. § 3142(g).

16       **2.      The Defendant Does Not Qualify for Release Pursuant to 18 U.S.C.**

17   **§ 3142**

18       All of the statutory factors continue to counsel against Chapman's release. The

19   Defendant's detention is required if "no condition or combination of conditions will

20   reasonably assure the appearance of [Chapman] as required and the safety of any other

21   person and the community." 18 U.S.C. §3142(e)(1).  Judge Fricke made these findings

22   during the initial detention hearing and determined that Chapman should be detained

23   pending trial. Dkt. 11.

24       *a.  The Nature and Circumstances of the Offense*

25       The nature and circumstances of this offense support detention.  The defendant's

26   alleged conduct is extremely concerning in this case and the risk to the community is

27   significant.  The defendant brought a cache of weapons, including an illegally altered

28   firearm and a stolen firearm, and over 3,800 rounds of ammunition into the Olympic

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 7

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  National Park.  He indicated that his actions were related to a revolution against the

2  government and wrote a letter that says in part, "Do it right Americans, [and] when the

3  ones who say they are proud [and] want those freedoms back as they point a gun at

4  you…Look them right back and shoot the sneaky, cowardly, treasoness [*sic*] punks!!!"

5  The defendant also fired two shots at a government drone with one of the weapons that he

6  brought.  The defendant argues that he was not a risk to anyone and that he merely

7  retreated to the woods, terrified for his safety.  However his paranoia, cache of weapons

8  and ammunitions, and stated willingness to shoot anyone who he deemed to be part of his

9  fictional revolution undeniably created a risk to the public.  He also endangered his

10 victim in this case, A.J., not only by the charged assault, but also his earlier attempts to

11 cut an imagined chip out of her arm.

12      Additionally, he started a fire in a national park during one of the hottest months

13 of the year, which could have had devastating consequences, and then appears to have

14 taken deliberate steps to interfere with emergency response to the Park including cutting

15 down a tree to block the road and disabling the emergency radio communication system

16 on the mountain.  He made statements to A.J. that he believed they were both going to die

17 and physically assaulted her when she tried to call for help.

18      Though the defendant did eventually surrender to law enforcement, that was after

19 days in the forest, approximately an hour of negotiating with police, and in response to

20 significant law enforcement presence including a SWAT Team and BearCat.  Defendant

21 included a portion of the police report detailing the negotiations in his Brief to the Court,

22 but omitted the proceeding page, which states the following:

23

24

25

26

27

28

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF MAGISTRATE COURT ORDERS OF DETENTION
U.S. v. Chapman, MJ21-05185- 8

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1
2
3

At this point, Olympic National Park was looking at the federal equivalent of Assault 4, domestic violence for an assault on Aimee Johnson. A radio repeater had gone offline on Blue Mountain, but we did not know at this point what involvement Caleb may have had in that. There had been a report that someone believed they had heard automatic gunfire near the summit of the mountain, where the repeater was located.

4
5
6
7
8

After the speaking with Agent Halla, Corporal Ordona and went and interviewed Caleb's brother, Travis Chapman at Travis' home. Travis told us that his brother has been using methamphetamine with increasing frequency lately. I learned that Caleb had cut Travis' phone and internet cables a little over a month ago because he was paranoid about someone listening in on their conversations. Travis informed us that Caleb had left a car trailer at his house Saturday night with some random items hastily assembled on it including a generator and other items. Travis also told us that Caleb left his children with Travis as an unplanned idea on Saturday, and Travis took the children out of concern for their safety because of how his brother was acting. Travis described his brother as very caring, and a good father.

9
10

When Corporal Ordona and I returned to the Sequim Police Station, I learned that the FBI SWAT team had developed a plan to drive up the ONP Deer Park Road, with a drone flying ahead of it as a scout. Detective Dropp had researched several reports and protection orders involving Caleb and I read those. The mother of Caleb's children, Delores Chapman, had died in a vehicle collision in 2018.

11
12

As a team, we worked to develop a planned approach to how we would talk with Caleb. We also discussed possibly using text message to start our conversation.

13
14
15

At about 1955 we received a report that Caleb had shot at the drone, and it was requested that we attempt to start a dialog with him. I attempted to call at 1959 and did not receive an answer, because of this, I started to attempt contact by text message and was successful. We exchanged text messages, and he agreed to answer his phone if I called, although initially he did not answer and told me by text that he had poor reception. I was able to make phone contact at 2031, and Caleb stayed on the phone with me for the next 49 minutes and 34 seconds.

16 The defendant's actions were simultaneously dangerously erratic and strategic, a

17 combination that repeatedly put the community at significant risk over the days that he

18 was in the Park.

19        b. *The Weight of the Evidence*

20        The Court is required to ascribe the least weight to the strength of the evidence,

21 among the four factors, when considering whether to release a defendant. *United States v.*

22 *Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). The weight of the evidence nonetheless

23 favors detention due to the strong evidence of the defendant's conduct in this case. A.J.'s

24 description of events is corroborated by the physical evidence, her documented injuries,

25 and witnesses' observations of the defendant's erratic behavior and verbal aggression

26 towards A.J. at the Park.

27        c. *The History and Characteristics of the Defendant*

28

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1     The Defendant does appear to family support and owns a home.  His criminal

2  history and domestic violence history, as well as his drug use, however support detention.

3  The defendant has a prior weapons conviction from 2001 where there was a warrant

4  issued for a failure to appear and he was out on a pending State charge at the time of this

5  offense.

6     A.J. reports a history of domestic violence assaults from the defendant. Law

7  enforcement records show multiple calls out to the residence that the two shared, most

8  recently on August 12th when A.J. ran to a neighbor's house and called 911 after the

9  defendant pushed her to the ground and kicked her.  There were three domestic violence

10 protection orders entered in 2017 prohibiting the defendant from contacting his ex-wife

11 and three minors.  In the accompanying petitions, Mrs. Chapman reported multiple

12 incidents of domestic violence abuse including strangulation, various physical assaults,

13 and verbal threats to use his AR 15 rifle on her.  Those protection orders were dismissed

14 due to Mrs. Chapman's death in an automobile accident in 2018.  Additionally, a 2017

15 police report states that the defendant was in possession of a firearm after being ordered

16 to surrender all firearms pursuant to the domestic violence protection orders mentioned

17 above. That report is attached as Appendix B.

18     While the Government is not interested in litigating the defendant's parenting, it is

19 worth noting that the defendant's brother took his children the night of the incident out of

20 concern for their safety based on how he was acting.  It is clear from the evidence that the

21 defendant is a danger to the community while on methamphetamine, and it is undisputed

22 that the defendant is a consistent methamphetamine user.  The defendant admits to

23 "sporadic" use, while his mother and brother described daily use.  *See* Supplemental

24 Pretrial Service Report (September 7, 2021).  A.J. also indicated that the defendant is a

25 habitual user.  The defendant's history, his drug use, and the fact that he committed this

26 offense while on release from another offense favor detention.

27          d.  *The Nature and Seriousness of the Danger Posed by the Defendant*

28

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 10

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       The defendant's behavior throughout this incident put the community at risk in a

2   variety of ways.  He started a forest fire, disabled a communication device meant for

3   emergency services, and assaulted A.J. when she tried to call the police.  He threatened to

4   shoot those who he considered the other side of the "revolution" that he believes is

5   coming and brought a cache of weapons and ammunition into the Park presumably for

6   that purpose.  His mental state and the interplay with his methamphetamine use, which

7   was described by A.J. as habitual, makes him unpredictable.  Given the facts of this case,

8   it is difficult to overstate the risk that he presents to the community if he is released and

9   becomes similarly agitated again.

10      *e.  No condition or combination of conditions will reasonably assure*

11         *Chapman's appearance as required and assure the safety of any other person*

12         *and the community.*

13      The defendant's release plan presents a number of risks given his addiction and

14  behavior when on methamphetamine.  These risks include indirect transportation to the

15  treatment facility, his ability to leave the treatment facility at any point, lack of

16  supervision in his post treatment placement, and the time for response if he were to

17  violate his conditions.  The defendant could choose not to report to the meeting place,

18  and could leave the treatment facility at any time.  If he did chose to deviate from the

19  court approved plan, Pretrial Services would not the capability for an immediate response

20  even with GPS monitoring.

21      Chapman's paranoia towards the Government presents challenges for GPS

22  monitoring as well.  Given the defendant's attempts to remove an imagined "chip" from

23  A.J.'s arm on the first day of the charged incident, there appears to be a significant

24  likelihood that the defendant would make efforts to remove the GPS bracelet if he was in

25  a similar paranoid state and/or chose to abscond.  Similar to situation if the defendant left

26  or failed to report to treatment, Pretrial Services would not be able to respond

27  immediately if that occurred, especially given the remote nature of the area in which the

28  defendant regularly lives.

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF
MAGISTRATE COURT ORDERS OF
DETENTION
U.S. v. Chapman, MJ21-05185- 11

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    The defendant presents a significant danger to the public and his appearance

2  cannot be assured if he is using methamphetamine. In a case with a lower risk of harm

3  when the defendant is using narcotics, this release plan may have been sufficient.

4  However, due to the defendant's dangerous, erratic, and paranoid behavior while using

5  narcotics, these conditions do not do enough to mitigate the risk and will not ensure the

6  safety of the public.

7                                    V. Conclusion

8    The Section 3142 factors justify detention in this case. For the reasons stated

9  above, the United States respectfully requests the Court continue to detain the defendant

10  pending resolution of these charges.

11

12    DATED this 12th day of November, 2021.

13

14

15                                    Respectfully submitted,

16                                    NICHOLAS W. BROWN
                                      United States Attorney

17

18                                    s/ Kristine L. Foerster
                                      Kristine L. Foerster
19                                    Assistant United States Attorney
                                      United States Attorney's Office
20                                    1201 Pacific Avenue, Suite 700
21                                    Tacoma, Washington 98402

22

23

24

25

26

27

28

GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR REVIEW OF      UNITED STATES ATTORNEY
MAGISTRATE COURT ORDERS OF                                   1201 PACIFIC AVENUE, SUITE 700
DETENTION                                                    TACOMA, WASHINGTON 98402
U.S. v. Chapman, MJ21-05185- 12                              (253) 428-3800